UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 23-10079-FDS |
| | ) | |
| PRIYA BHAMBI, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in connection with the sentencing of defendant Priya Bhambi. For the reasons set forth below, the government recommends that the Court impose the following sentence: incarceration for 78 months, three years of supervised release, restitution and forfeiture each in the amount of $2,585,480, and a $400 special assessment.[1]

## I.     INTRODUCTION

Over the course of approximately ten months in 2022, the defendant used her senior-level position at Takeda Pharmaceutical Company Limited ("Takeda") to orchestrate a complex fraud to steal millions of dollars from her employer. She did so by submitting fabricated invoices on behalf of a sham consulting company, Evoluzione Consulting LLC ("Evoluzione"), that she incorporated – in coordination with her boyfriend at the time, co-defendant Samuel Montronde – for the purpose of defrauding Takeda.

---

[1] The government intends to file an amended forfeiture motion (to replace the motion at Dkt. 109) and will respectfully request that the Court enter the proposed orders to be attached thereto. The government is not recommending a fine in light of the substantial restitution and forfeiture amounts.

The defendant's motive was simple: greed. Bhambi's and Montronde's goal, made plain in their text messages, was to "become millionaires and . . . retire." They used the money they stole from Takeda to purchase a Mercedes-Benz Model E and a diamond engagement ring; make a down payment on a $1.875 million condominium in Boston's Seaport neighborhood; and place a deposit on a wedding venue. Bhambi did all of this notwithstanding the fact that she was earning an annual salary of nearly $500,000 at the time. And she would have stolen more, but for the fact that Takeda discovered her scheme.

While the charged conduct began in 2022, Bhambi's "hustle" dates back to 2018. After directing her friend to incorporate a sham consulting company called Optimum Strategy Consultants, LLC ("Optimum"), Bhambi falsely represented to Takeda that Optimum was a new vendor that could provide cost-effective services. Taking advantage of her authority to engage third-party IT consultants with high-dollar contracts, Bhambi caused Takeda to execute an agreement with Optimum, and ultimately to make payments to Optimum totaling approximately $285,480[2] for purported consulting services that were never provided. This fraud – interrupted by the COVID-19 pandemic – laid the groundwork for the Evoluzione scheme. As Bhambi told Montronde, "feels like I've been plotting for forever."

The defendant pled guilty to the four-count indictment charging conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One), and three counts of wire fraud, in violation

---

[2] This amount is included in the government's proposed restitution and forfeiture figures. *See United States v. Acosta*, 303 F.3d 78, 87 (1st Cir. 2002) (where the offense involved a scheme, conspiracy, or pattern of criminal activity, any conduct that is in the course of the scheme, conspiracy, or pattern may be considered in calculating restitution, without regard to whether the conduct that harmed the victim was conduct underlying the offense of conviction); *United States v. Cox*, 851 F.3d 113, 128 (1st Cir. 2017) (a court may order forfeiture of the proceeds from uncharged conduct that was part of the same fraudulent scheme alleged in the count(s) of conviction).

of 18 U.S.C. § 1343 (Counts Two through Four).[3] Notwithstanding her guilty plea and the overwhelming evidence of her brazen fraud, as discussed further below, Bhambi's conduct since being charged and pleading guilty, and several of her objections to the Presentence Investigation Report ("PSR"), suggest that she has not fully accepted responsibility for her crimes, and the government has serious concerns about her risk of recidivism.

For her actions, the government respectfully recommends that the Court sentence Bhambi to 78 months in prison and three years of supervised release, and order her to pay restitution and forfeiture each in the amount of $2,585,480, in addition to the mandatory special assessment of $400. For all of the reasons set forth herein, the government's recommended sentence is sufficient but not greater than necessary to serve the purposes of sentencing under 18 U.S.C. § 3553(a).

## II.     THE OFFENSE AND RELEVANT CONDUCT

The offense conduct is summarized above and set forth in detail in the PSR. *See generally* PSR ¶¶ 8-38. In early 2022, Bhambi falsely told employees of Takeda that Optimum had completed work in fiscal year 2021 but had not been paid because the contract had "slip[ped] through the cracks." PSR ¶ 11. She further stated falsely that Optimum had been acquired and asked what would be required to pay the acquiring company for the services purportedly provided by Optimum. *Id.*

The defendant then told Montronde, whom she had just recently started dating, that she had "put some wheels in motion to pursuit [sic] a small hustle." PSR ¶ 13(a). Bhambi told Montronde that because she could not "be the face of it," he would "have to do some paper work," and they would "have to open some accounts," "[d]ecide on a brand [he] fe[lt] comfortable with," and "[c]ome up with a name." *Id.* Shortly thereafter, Bhambi and Montronde incorporated

---

[3] There is no plea agreement in this case.

Evoluzione, with Montronde as the signatory, and Bhambi submitted paperwork to Takeda purporting to confirm Evoluzione's acquisition of Optimum. PSR ¶ 15.

To deceive Takeda into believing that Evoluzione was a legitimate consulting business, the defendant, in coordination with Montronde, created two phony Evoluzione email accounts – one for Montronde and one for a fake employee they named "Jasmine" – and a website for Evoluzione with false information, including three fabricated blog posts. PSR ¶¶ 14, 22. Bhambi also submitted a statement of work to Takeda, which listed the fake employee "Jasmine" as among the "key personnel" who would purportedly provide services on behalf of Evoluzione. PSR ¶ 15. She and Montronde then caused Takeda to sign a master services agreement with Evoluzione, and to issue a purchase order to Evoluzione for consulting services with a total cost of $3,542,000. PSR ¶ 20.

At the defendant's direction, Montronde opened business bank accounts in the name of Evoluzione to receive direct payments from Takeda. PSR ¶¶ 16-17, 27. Between March and May of 2022, Bhambi, in coordination with Montronde, fabricated and submitted to Takeda five separate invoices on behalf of Evoluzione for purported consulting services that Evoluzione had not performed (and never did perform), each in the amount of $460,000. PSR ¶ 21. When questioned by Takeda employees, Bhambi made false representations regarding the services purportedly performed by Evoluzione, and falsely stated that Evoluzione had "delivered on time and within budget." PSR ¶ 24. The defendant also provided a false explanation for why all five invoices "hit" at the same time, claiming that Evoluzione had "started work with [Takeda] about a year ago" but there had been "a backlog in there [sic] billing, because of a contracts issue" that had since been resolved. *Id.*

Based on Bhambi's false representations, between June and July of 2022, Takeda made three payments of $460,000 each to Evoluzione. PSR ¶¶ 25, 31. All of those funds were deposited into the business bank accounts Montronde had opened. *Id.* Then, in early September 2022, Takeda employees began raising additional questions about the services purportedly provided by Evoluzione. PSR ¶ 33. When a Takeda employee emailed the Evoluzione account in Montronde's name seeking to discuss the matter, Bhambi and Montronde responded, pretending to loop in the fake Evoluzione employee they had created named "Jasmine," falsely stating that "Jasmine" "ha[d] been working directly on the account . . . and [could] provide any details[.]" *Id.* Thereafter, Takeda employees made repeated attempts to coordinate a phone call with Montronde and "Jasmine." *Id.* In the meantime, Takeda made two additional payments of $460,000 each to Evoluzione. PSR ¶¶ 34, 36.

In response to the emails from Takeda employees attempting to coordinate a call, Bhambi and Montronde used the Evoluzione email accounts to respond on behalf of both Montronde and "Jasmine," making additional false statements about the services purportedly provided by Evoluzione and excuses as to why they had not responded to emails and could not or did not join scheduled calls. PSR ¶¶ 35, 37. The defendant, using her Takeda email address, pretended to communicate with "Jasmine," despite knowing that "Jasmine" did not exist, ultimately communicating to both "Jasmine" and Takeda employees that Takeda did "not require anything else" from Evoluzione. PSR ¶ 37. Takeda subsequently initiated an internal investigation and terminated Bhambi. PSR ¶ 38.

## III.    THE SENTENCING GUIDELINE RANGE

The government respectfully submits that pursuant to the calculation set forth below, Bhambi's total offense level under the Sentencing Guidelines is 28, yielding a guideline imprisonment range of 78 to 97 months:

- Base offense level of seven (USSG §2B1.1(a)(1));

- Increase of 18 because the intended loss attributable to the offense is more than $3.5 million but not more than $9.5 million (USSG §2B1.1(b)(1)(J));

- Increase of two because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means (USSG §2B1.1(b)(10)(C));

- Increase of two based on the defendant's aggravating role in the offense (USSG §3B1.1(c))[4];

- Increase of two because the defendant abused a position of private trust (USSG §3B1.3); and

- Decrease of three for acceptance of responsibility (USSG §3E1.1).[5]

With the exception of the aggravating role enhancement, which the Probation Office has declined to apply, this calculation aligns with that set forth in the PSR. Bhambi contends that the Court should use actual loss as opposed to intended loss in calculating her offense level and objects to application of the sophisticated means, aggravating role, and abuse of position of trust enhancements.[6] The Court should reject the defendant's arguments for the reasons set forth below.

---

[4] Because, in the government's view, an aggravating role enhancement applies under §3B1.1, Bhambi does not meet the criteria for the zero-point offender adjustment. *See* USSG §4C1.1(a)(10).

[5] While this calculation includes an adjustment for acceptance of responsibility, as noted above and discussed further below, the government questions whether the defendant has fully accepted responsibility for her crimes.

[6] These enhancements can be applied together. *See, e.g., United States v. Reyes-Rivera*, 812 F.3d 79, 88 (1st Cir. 2016) (no plain error in district court's determination that two-point

A.      **Loss is the Greater of Actual Loss or Intended Loss**

Bhambi asserts that the loss amount must be driven by the actual loss suffered by Takeda.

That is incorrect. Pursuant to Application Note 3(A) of the commentary to §2B1.1, loss is the

greater of actual loss or intended loss. Bhambi argues that because this language appears in the

commentary and not the text of §2B1.1, the Supreme Court's decision in *Kisor v. Wilkie*, 588 U.S.

558 (2019), requires the use of actual loss in calculating a defendant's offense level.[7] That is not

the law in the First Circuit. In any event, the issue will be rendered moot in a matter of days by the

Sentencing Commission's adoption of an amendment that moves the general rule establishing loss

as the greater of actual or intended loss from the commentary to the guideline itself.[8]

The defendant correctly notes that in *United States v. Banks*, 55 F.4th 246, 255-58 (3d Cir.

2022), the Third Circuit, applying *Kisor*, held that Application Note 3(A) is not entitled to

deference and that the term "loss" in §2B1.1 unambiguously refers only to actual loss. However,

the Third Circuit's holding in *Banks* is an outlier and is not controlling in the First Circuit. Indeed,

the Third Circuit's view has been squarely rejected by at least one other circuit. *See United States

v. You*, 74 F.4th 378, 397-98 (6th Cir. 2023) (rejecting "*Banks*'s attempt to impose a one-size-fits-

---

enhancement for defendant's leadership role, two-point enhancement for use of sophisticated
means, and two-point enhancement for abuse of position of trust each applied).

[7] Prior to *Kisor*, guideline commentary was authoritative unless it violated the Constitution
or a federal statute, or was inconsistent with, or a plainly erroneous reading of, the guideline. *See
Stinson v. United States*, 508 U.S. 36, 38 (1993). However, as explained by the Sentencing
Commission, following *Kisor*, which limited courts' deference to agencies' interpretation of their
own regulations, "the deference afforded to various guideline commentary provisions has been
debated and is the subject of conflicting court decisions." https://www.ussc.gov/sites/default/files/
pdf/amendment-process/official-text-amendments/202405_Amendments.pdf at 7.

[8]      *See*      https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-
amendments/202405_Amendments.pdf at 4-8.

all definition" of loss as "not persuasive" and holding that "[t]he context and purpose of the Guidelines clarify that 'loss' can also mean intended loss").[9]

Further, while the First Circuit has not decided this particular issue, the Court has deferred to the Sentencing Commission's definition of loss for years, and recently declined to find plain error in the district court's use of intended loss in calculating the applicable guideline range. *See United States v. Gadson*, 77 F.4th 16, 19-22 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 823 (2024). In *Gadson,* the Court noted that although it had "never squarely addressed a challenge to the commentary's use of intended loss (either before or after *Kisor*)," it had "regularly – both before and after *Kisor* – explained the concept in the context of loss calculation challenges." *Id.* at 21 (citing cases). The Court continued as follows:

> In none of these cases have we expressed any doubt regarding the use of intended loss. To the contrary, we have described such use approvingly, noting that "[i]n fraud cases, amount of loss is meant to be a *proxy for the harm* (both actual and intended) inflicted by the fraudster's nefarious activities," [*United States v. Flete-Garcia*, 925 F.3d 17, 33 (1st Cir. 2019)] (emphasis added), and that "intended loss is frequently *a better measure of culpability* than actual loss," *United States v. Appolon*, 695 F.3d 44, 67 (1st Cir. 2012) (emphasis added).

*Id.* The Court concluded that "[t]hese statements provide, at the very least, reasonable arguments as to why 'loss' as used in section 2B1.1 does not unambiguously mean only actual loss, and why 'intended loss' falls within that term's 'zone of ambiguity.'" *Id. (citing Kisor*, 139 S. Ct. at 2415-16).

---

[9] The government maintains that *Banks* was incorrectly decided for at least two reasons. First, *Banks* failed to consider the history, purpose, and structure of the Guidelines, which uniformly demonstrate that, even without looking to the commentary, loss in §2B1.1(b)(1) should be understood to include intended loss. Second, even if the history, purpose, and structure of the Guidelines were not conclusive in this regard, they at a minimum reveal ambiguity about the meaning of loss, and, under *Kisor*, such ambiguity should result in deference to the Sentencing Commission's definition of the term.

Finally, as noted above, the Sentencing Commission has adopted an amendment, effective November 1, 2024, explicitly affirming the commentary definition of loss as the greater of actual loss or intended loss. By moving this general rule from the commentary to the guideline itself, the Commission will have effectively nullified the Third Circuit's holding in *Banks*, in an effort to ensure consistent loss calculation across circuits. There can therefore be no real question that going forward, intended loss is a valid measure of loss under §2B1.1, and where intended loss is greater than actual loss, it is that figure courts should use in calculating a defendant's guideline range.[10]

Intended loss is defined as "the pecuniary harm that the defendant purposely sought to inflict." §2B1.1 cmt. n.3(A)(ii).[11] Here, the intended loss attributable to the charged offense is $3,542,000 – the total cost of the purported services to be provided by Evoluzione per the purchase order that Bhambi caused Takeda to issue. *See* PSR ¶ 20. There can be no serious dispute that if Takeda had not uncovered their scheme, Bhambi and Montronde would have continued causing Evoluzione to issue, and Takeda to pay, invoices up to the total amount of the purchase order. Accordingly, the purchase order amount of $3,542,000 represents the pecuniary harm that the defendant purposely sought to inflict, and it is this figure that should be utilized in calculating her offense level. As discussed above, Bhambi defrauded Takeda of an additional $285,480 through relevant conduct, resulting in a total intended loss of $3,827,480 and a corresponding 18-level increase pursuant to §2B1.1(b)(1)(J).

---

[10] Bhambi acknowledges the Sentencing Commission's amendment to §2B1.1 but argues that because it has yet to go into effect, it should have no bearing on her sentencing. That makes little sense. The amendment becomes effective two days after the defendant's sentencing hearing, making the law – which has remained unchanged in this Circuit – clear going forward.

[11] The Sentencing Commission's amendment to §2B1.1 also moves the definitions of actual loss and intended loss from the commentary to the text of the guideline.

### B.       The Sophisticated Means Enhancement Applies

The government agrees with the Probation Office's conclusion that a two-level increase applies under §2B1.1(b)(10)(C) because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. *See* PSR ¶ 45. As set forth above and in the PSR, the defendant, in coordination with Montronde, incorporated a sham consulting company, created phony business email accounts and used those accounts to communicate with Takeda employees to further and conceal her fraud, created a phony business website with fabricated blog posts, submitted fabricated records and invoices to Takeda to obtain payments for invented consulting services that were never provided, and opened sham business bank accounts to funnel the fraud proceeds.

Application Note 9(B) of the commentary to §2B1.1 defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." The application note provides several examples of conduct constituting sophisticated means, including the precise means that Bhambi employed: use of fictitious entities. *See also United States v. Kitts*, 27 F.4th 777, 790 (1st Cir. 2022) (finding sophisticated means enhancement warranted based on unauthorized use of client's signature and creating a fake company, and collecting cases); *United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015) (upholding application of sophisticated means enhancement where defendant "set up multiple corporate entities in order to facilitate his fraudulent schemes").

The First Circuit has recognized that the sophisticated means enhancement may apply even where the conduct is *less* sophisticated than the examples cited in the application note. *See United States v. Doley*, 783 F.3d 7, 25 (1st Cir. 2015). Moreover, a "scheme may be sophisticated even if the individual elements taken alone are not." *Id.* (citing *United States v. Evano*, 553 F.3d 109, 113

(1st Cir. 2009)). Here, Bhambi took each of the sophisticated steps outlined above to perpetrate and conceal her fraud. As noted in the addendum to the PSR, "[e]ach step alone taken by the defendant may not have been especially complex, but combined these steps demonstrate a complex and intricate means of successfully executing the scheme to defraud the victim of millions of dollars."

Bhambi's objection to application of the sophisticated means enhancement rests primarily on the baseless assertion that Evoluzione was not a sham but rather "a company that she hoped would evolve into a viable and successful business." This assertion is simply not credible. Like Optimum, Evoluzione was a sham from the outset, as evidenced by its incorporation documents that describe Evoluzione, in part, as "a team that is committed to transforming the organizations that it works with." There was no "team" outside of Bhambi and Montronde – indeed, the other members of the "team" were invented – and Evoluzione did not work with any organizations outside of its sham consulting agreement with Takeda. Further, Bhambi and Montronde spent their fraud proceeds, not to build Evoluzione into a legitimate business, but to live lavishly. The intent was not to create a viable entity but to "become millionaires and . . . retire." Regardless, Bhambi's purported hopes for Evoluzione's future have no bearing on the *means* by which she orchestrated and executed the charged fraud scheme.

### C.     A Two-Level Aggravating Role Enhancement Applies

The government respectfully submits that an additional two-level increase applies under §3B1.1(c) because of the defendant's aggravating role in the offense. As the offense conduct makes clear, Bhambi was the organizer and leader of the scheme. She orchestrated the "side hustle," "put [the] wheels in motion" to pursue it, and directed Montronde in executing it, even referring to herself as "Geppetto" (*i.e.*, the puppet master). PSR ¶ 13. Bhambi created the phony Evoluzione

website and email accounts; submitted the fraudulent acquisition letter and statement of work to Takeda; coordinated Takeda's signing of a master services agreement with, and issuance of a purchase order to, Evoluzione; instructed Montronde that, with respect to incorporating Evoluzione, he would "have to do some paper work" because she could not "be the face of it" (PSR ¶ 13(a)); directed Montronde with respect to opening business bank accounts and setting up direct payments; fabricated and submitted fraudulent invoices to Takeda on behalf of Evoluzione; and was primarily responsible for the false representations to Takeda to secure payment of the invoices. The evidence clearly demonstrates – contrary to Bhambi's contention that she and Montronde were equal partners – that Bhambi exercised decision-making authority over Montronde, acting in a managerial capacity while Montronde occupied a subordinate position. In short, the aggravating role enhancement appropriately reflects Bhambi's relative culpability.

The government respectfully disagrees with the Probation Office's conclusion that an aggravating role increase is unwarranted. While Bhambi and Montronde were romantically involved and shared in the proceeds of their fraud scheme, Montronde took steps in furtherance of the scheme only at Bhambi's direction. The defendant exercised control over the scheme, and Montronde's part in it, by virtue of her employment with Takeda. The very nature of the scheme, and the fact that Bhambi originated it in coordination with someone else, demonstrates her aggravating role. While Montronde was in no sense an unwitting participant, Bhambi was the central figure in the fraud, making decisions and providing direction at every turn. There was no real division of labor; Bhambi simply instructed Montronde to take the steps she could not take on her own (*e.g.*, opening business bank accounts on behalf of Evoluzione). Bhambi may have spoken in terms of "we" and asked for Montronde's input to make him feel included and ensure he "bought in," but the reality is that Bhambi, like "Geppetto," was pulling the strings.

**D.      The Abuse of Position of Trust Enhancement Applies**

The Probation Office correctly applied the abuse of position of trust enhancement under §3B1.3. The defendant boldly argues that while she "clearly occupied a position that involved professional or managerial discretion, the decision to award the contract [to Evoluzione] was independently vetted by both the legal and procurement departments [at Takeda]." It is true that the consulting agreement was vetted through Takeda's internal processes and procedures, and it was approved based on Bhambi's lies. It was precisely because the defendant was familiar with Takeda's complex vendor procurement process that she was able to successfully defraud her employer. And it was largely because of Bhambi's senior-level position within the company that lower-level employees in procurement and other departments did not feel comfortable confronting her regarding Evoluzione, even when they suspected wrongdoing. The defendant's position at Takeda therefore contributed significantly to facilitating both the commission and concealment of the offense.

The victim impact statement submitted by Takeda, which explains – from the company's perspective – the ways in which Bhambi took advantage of her position to deceive other Takeda employees and the damaging impact her conduct has had on the company, further supports application of the abuse of position of trust enhancement. *See also* PSR ¶ 39. The defendant flagrantly violated her employer's trust, enriching herself at the expense of the company, its employees, and shareholders. Simply put, if this case does not warrant an abuse of position of trust enhancement, it is difficult to imagine an employee embezzlement case that would.

**IV.     THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The government respectfully submits that the relevant factors under 18 U.S.C. § 3553(a) support the imposition of a meaningful term of imprisonment in this case. Given the serious nature

of the offense, the defendant's history, and the need for both general and specific deterrence, among other considerations, the government's recommended sentence – incarceration at the low end of the guideline range – is sufficient but not greater than necessary to achieve the goals of sentencing.

**A.      The Nature and Circumstances of the Offense Warrant a Meaningful Term of Imprisonment**

Bhambi took advantage of her senior-level position at Takeda, and the substantial level of trust the company placed in her, to steal millions of dollars that she was not entitled to. All of the steps she took to orchestrate and execute the fraud, starting by laying the groundwork with Optimum back in 2018, demonstrate that this was not an isolated crime of opportunity. It was not a mistake or a momentary lapse of judgment. It was a series of calculated steps, and an effort to steal as much money as possible without getting caught.

Bhambi did not steal in order to support an addiction or to repay financial debts, and while neither would excuse her conduct, this sets her apart from other embezzlement defendants. She was earning an annual salary of nearly $500,000 – more money than most can fathom. But that was not enough. The defendant wanted to become a millionaire and retire, and live lavishly in the meantime. Her crime was fueled by greed, full stop.

Moreover, the defendant's scheme came to an end only because she got caught. Her conduct makes clear that she was committed both to continuing her scheme and to keeping it hidden indefinitely. At every point during this ten month period, Bhambi sought to promote and prolong her fraud. If Takeda had not caught on, there would have been more fraudulent invoices, up to the full amount of the purchase order, if not additional statements of work and purchase orders, and possibly even new sham companies to follow in Evoluzione's footsteps. Bhambi consistently chose to do the wrong thing – to steal over and over again, and to lie over and over

again when questioned about her theft. These factors underscore the serious nature of the defendant's crime and weigh in favor of a meaningful prison sentence.

**B.    The Defendant's History and Characteristics Weigh in Favor of the Government's Recommended Sentence**

The defendant's history and characteristics also support the government's sentencing recommendation. Bhambi has had more advantages than most defendants who appear before this Court. She grew up in a loving household, and her family did not endure any financial hardships. PSR ¶ 63. She has resided in Brookline, Massachusetts for the majority of her life. PSR ¶ 65. She has a bachelor's and a master's degree from Northeastern University and has held high-level jobs at multiple pharmaceutical companies, earning generous salaries. PSR ¶¶ 75, 79-80.

Unlike many defendants, Bhambi has not struggled with poverty, addiction, or a lack of education and opportunity. To be clear, while these challenges do not excuse criminal conduct, they often provide some degree of context for it. That is not the case here. The government is aware of no compelling mitigating factors, and no reasonable explanation for the defendant's conduct other than greed and entitlement – a desire to steal as much money as possible without getting caught, and a mistaken belief that she was somehow above the law.

**C.    A Significant Incarcerative Sentence Appropriately Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment and Adequate Deterrence**

The government's recommended sentence not only reflects the serious nature of the offense, but also promotes respect for the law and provides both just punishment and adequate deterrence. The defendant's crimes offend the rule of law, and in this case the need for general deterrence is especially significant. Theft perpetrated by employees is a relatively common crime that often occurs with disquieting ease. It runs the spectrum with varying degrees of severity, is accomplished through a variety of methods – both sophisticated and unsophisticated, and is not

always easily detected. There are countless companies like Takeda that run on trust. They depend on their employees to operate with integrity, especially those in senior-level positions with substantial decision-making authority. A meaningful term of imprisonment is necessary to deter others who might be tempted to take advantage of positions of trust to steal from their employers. Those who consider doing so should know that when they get caught, they will face serious consequences, and not only in the form of financial penalties. Absent a significant prison sentence, others inclined to engage in this type of criminal conduct may decide that it is worth the risk, particularly if they "stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

In this case, there is also a need for specific deterrence. While Bhambi is a first-time offender, she is a repeat fraudster. After her Optimum scheme was interrupted by the COVID-19 pandemic, she picked up right where she left off with Evoluzione. There is no doubt that her scheme would have continued, and likely expanded, if Takeda had not discovered it. Perhaps most concerningly, it appears that the defendant – like many serial white-collar criminals – has begun to believe her own lies. In her objections to the PSR, Bhambi claims that both Optimum and Evoluzione provided legitimate services to Takeda. The government is not aware of any support for that claim. And, as discussed above, the defendant's assertion that her intent was to build a legitimate company that could provide valuable services is simply not credible.

Further, since being charged, the defendant has repeatedly used her former Takeda title on various websites promoting her consulting experience in an apparent attempt to raise her professional profile. To the government's knowledge, this issue was first brought to Bhambi's attention in the fall of 2023, and it was the government's understanding that she agreed to remove all Takeda references from her online profile. Then, on an active website that was updated as

recently as this month, Bhambi represented herself as VP of the Office of the Chief Digital & Technology Officer at Takeda. This is a troubling pattern of conduct that shows a lack of understanding regarding the serious nature of the defendant's crimes and also suggests a lack of remorse.

All of the above undercuts the notion that Bhambi has genuinely and completely accepted responsibility for her criminal conduct.[12] And it raises a real concern that she poses a risk of recidivism. These considerations too counsel in favor of the government's recommended sentence.

### D.    The Need to Avoid Unwarranted Sentencing Disparities

While comparisons to other embezzlement cases are inherently imperfect given the case-specific circumstances that drive sentencing in each case, the government's recommendation here is reasonable based on sentences imposed in similar cases in this District. For example, in *United States v. Figelski*, No. 20-cr-10008-FDS, this Court accepted a Rule 11(c)(1)(C) plea agreement and imposed a 36-month sentence on a defendant who embezzled approximately $800,000 from her employer over two years. There, the defendant, a single mother to a young child, was a first-time offender who did not use the funds to live a life of luxury, but rather to fund her opioid addiction. Bhambi stole nearly three times as much money, under vastly different circumstances. Further, outside the embezzlement context, courts in this District have recently imposed substantial sentences in white-collar cases. For example, in *United States v. Xigoros*, 21-cr-10283-NMG, the

---

[12] The fact that Bhambi pled guilty to the charges does not in and of itself entitle her to a reduction for acceptance of responsibility. *See United States v. Muriel*, 111 F.3d 975, 982 (1st Cir. 1997) ("A defendant who pleads guilty is not entitled to a downward adjustment for acceptance of responsibility as a matter of right."). Where a defendant "has resorted to half-truths or evasions from the truth in an effort to minimize his or her culpability," courts have the discretion to deny the reduction. *Id.* at 982-83. *See also Gadson*, 77 F.4th at 22-23 (no clear error in district court's denial of reduction for acceptance of responsibility where defendant pled guilty well in advance of trial but disputed his role in the scheme).

Court accepted a Rule 11(c)(1)(C) plea agreement and imposed a sentence of 109 months on the defendant, a money manager who defrauded his clients of approximately $4.3 million. *See also United States v. Abbas*, 20-cr-10016-LTS (defendant convicted at trial for participating in multi-year money laundering scheme involving more than $1.5 million in loss received a 108-month sentence).

The government recognizes that its recommended sentence of 78 months is significant, and does not take its responsibility to recommend an appropriate sentence lightly. The government believes that its guideline calculation is correct and that a low-end guideline sentence is appropriate, as there is no articulable basis for a downward variance given all of the circumstances discussed above. And while significant, the government's recommended sentence is not out of line with sentences imposed on other embezzlement and white-collar defendants in this District. A sentence of 78 months properly reflects the seriousness of Bhambi's offense, promotes respect for the law, provides just punishment, and will serve to deter the defendant from re-offending and others from engaging in similar conduct.

## CONCLUSION

For the foregoing reasons, the government recommends that the Court impose the following sentence: incarceration for 78 months, three years of supervised release, restitution and forfeiture each in the amount of $2,585,480, and a $400 special assessment.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:     */s/ Leslie A. Wright*
LESLIE A. WRIGHT
Assistant United States Attorney

18

**<u>Certificate of Service</u>**

I hereby certify that this document was filed through the ECF system on October 25, 2024 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By:   <u>*/s/ Leslie A. Wright*            </u>
       LESLIE A. WRIGHT
       Assistant United States Attorney