UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____  )
                                           )
UNITED STATES OF AMERICA                   )
                                           )
            v.                             )      Criminal No. 23-cr-10079-FDS
                                           )
                                           )      **Leave to File Under Seal Granted On**
PRIYA BHAMBI,                              )      **October 24, 2025 (Dkt. Entry 117)**
                                           )
            Defendant.                     )
_____  )

**PRIYA BHAMBI'S SENTENCING MEMORANDUM**

It is a tragedy that a person like Priya Bhambi finds herself before this Honorable Court. The only daughter of two immigrants, Ms. Bhambi overcame the loss of her father when she was just 18 years old to achieve significant success in the corporate world, while still always finding time for family, friends, and charitable causes. Ms. Bhambi has committed a lifetime to charitable endeavors and good deeds, out of the spotlight, without even a single interaction with the criminal justice system, and she has been an extraordinary sibling and daughter—to those who know her best, Priya's current predicament is unfathomable. *See, e.g.* Letter of Supriya Refai (Exhibit 6) ("I understand the seriousness of the allegations against Priya, but I believe they are incredibly out of character for the person I have known and loved for over three decades.").

Yet, here Ms. Bhambi stands, to be sentenced in a Federal Court, against the backdrop of a loss table that "wars with common sense." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012); *see* Section IV, *infra*. Ms. Bhambi acknowledges and sincerely appreciates that she has admitted guilt to, and stands convicted of, serious criminal offenses. *See* Letter of Priya Bhambi (Exhibit 2). Through the submission of this pleading (and the arguments set forth herein), she does not, in any respect, seek to depreciate or minimize the gravity of harm inflicted by her

1

conduct; instead, the defense merely seeks to place her conduct in the proper context, and to provide the Court with a full, three-dimensional understanding of the human being that stands before the Court.

With a full consideration of these elements, the defense respectfully submits that a sentence of 12 months fully and properly serves all goals of sentencing in this matter.  A sentence of 12 months is a significant punishment, particularly for a first-time offender with no prior interaction with the criminal justice system.  Indeed, as the letters of support demonstrate, Priya has already endured enough punishment for a lifetime, and whatever the prison term her life is forever diminished and altered because of her misconduct here.  A sentence of 12 months also more than adequately fulfills the goals of specific and general deterrence—indeed, one reading of the letters of support to the Court amply demonstrates that no rational human being would knowingly or intentionally walk the path Priya has endured over the past two years.

Ms. Bhambi understands, however, there are other factors at play—including a victim impacted by her actions.  In the end, the defense respectfully urges the Court to impose a sentence of no more than 12 months incarceration—a sentence fully consistent with the objectives of § 3553(a), and the parsimony principle expressed therein that the Court should impose a sentence sufficient, but not more than necessary, to comply with the purposes of § 3553(a).

I.    _To understand how Priya Bhambi comes before this Court, one must understand her childhood and the cultural pressures of her heritage._[1]

On the surface, Priya Bhambi's life was a remarkable success.  One of three children

---

[1] The Court is no longer straitjacketed regarding the types of information it should consider in imposing a reasonable sentence.  18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  This statute, like the parsimony principle contained in 18 U.S.C. § 3553(a), assumes greater significance in the post-*Booker* sentencing regime.

born to Harish and Meena Bhambi, Priya was raised in a "loving" and "kind" family home. PSR at ¶63. The Bhambi children were raised in "a studious household," and Priya enjoys a very close relationship with her two older brothers, upon whom she has relied heavily in these difficult times. *See, e.g.* PSR at ¶¶64, 66 (oldest brother confirming "his family has always been very loving and close"). After graduating from Brookline High School and Northeastern University, Priya quickly rose through the ranks of the corporate world, eventually becoming Chief of Staff at Takeda Pharmaceuticals. But, as can often be the case, the outward successes masked serious mental health struggles that caused turmoil and unrest in Ms. Bhambi's personal life.

In 2002, when Priya was one month from high school graduation, her father passed away from colon cancer. PSR at ¶63. While Priya was "numb" to the passing in real time, and "suppressed her feelings after his passing," PSR at ¶63, it would end up a defining moment in her life—in ways that Priya is just now beginning to understand. In the wake of her arrest in this matter, Priya began undergoing intense therapy. During this process, she has learned many things about herself. In particular, it has become evident that Priya did not adequately cope with her father's passing. PSR at ¶72. She likewise did not realize how much she was bending her conduct to cultural pressures of finding a suitable life partner—someone that would satisfy her family and make her late father proud. PSR at ¶72 ("Since April 2024, the defendant has attended weekly zoom counseling sessions . . . to help her cope with her father's passing, the expectations of her culture, the high standards she sets for herself, the pressure to get married and have children, and anxiety and depression due to the instant case").

Given this realization, and the seeming incompatibility of Ms. Bhambi's entire life history to the conduct in this case, counsel engaged Dr. Jhilam Biswas to conduct a clinical and

psychosocial evaluation of Ms. Bhambi.  Dr. Biswas is an American Board of Psychiatry and Neurology (ABPN) certified forensic psychiatrist who completed her psychiatry residency in 2014 at the Harvard Longwood Residency Training Program in Boston, MA, and her subspecialty fellowship in Psychiatry and Law in 2015 at the University of Massachusetts Medical School in Worcester.  Biswas Report, attached hereto as Exhibit 1 (submitted under seal), at 2.  Dr. Biswas is presently the director of the Psychiatry, Law, and Society Program at Brigham and Women's Hospital in Boston, and she is a member of the faculty of Harvard Medical School.  Ex. 1 at 2-3.  Dr. Sumedha Purkayastha assisted Dr. Biswas in her examination and evaluation of Ms. Bhambi.  Dr. Purkayastha is an "an ABPN-certified general psychiatrist who is completing a forensic psychiatry fellowship at Mass General Brigham/Harvard Medical School."  Ex. 1 at 3.  She completed her psychiatry residency at Icahn School of Medicine at Mount Sinai/Elmhurst Hospital, and her child and adolescent psychiatry fellowship at Tulane University.  Ex. 1 at 3.

Dr. Biswas' report and findings are quite remarkable.  First, Dr. Biswas explains the outsized role that Ms. Bhambi's cultural heritage plays in her life, and how those cultural pressures contributed to the conduct in this case. ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ Biswas Report, Ex. 1, at 4.  Dr. Biswas concluded that ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ Biswas Report, Ex. 1, at 2. Dr. Biswas further concluded that Priya's "actions at Takeda Pharmaceuticals reflect a significant decline in decision-making, insight, and

judgment, ███████████████████████████████████████████████████████

██████████████████████████████████████ Biswas Report, Ex. 1, at 2. As noted by Dr.

Biswas, "[t]he intense social pressures around marriage and career in South Asian American

communities are well-documented, rooted in cultural values, immigrant aspirations, and the

challenge of navigating a bicultural identity." Biswas Report, Ex. 1, at 10. "These pressures,

████████████████████████████████████████████████████████████████

████████████████████████████████████████ "led to a significant lapse in judgment" during

her time at Takeda. Biswas Report, Ex. 1, at 10.

Dr. Biswas concluded that, in her "clinical opinion, ████████████████████

█████████████████████████████████████████ which took multiple sessions to

understand fully." Biswas Report, Ex. 1, at 2. Dr. Biswas concluded that they "stem from

████████████████████████████████████████████████████████████████

██████████████ Biswas Report, Ex. 1, at 2. "Interviews with her life coach, therapist, and family

members confirmed this but emphasized that she is not driven by greed. Instead, she was

primarily focused on building a career, trying to be worthy of her parents, marriage, and

children, though she struggled with long-term relationships." Biswas Report, Ex. 1, at 2. Dr.

Biswas concluded:

> In some cases, like Ms. Bhambi's, these pressures, combined with poor coping skills,
> can push individuals into unethical behavior to meet societal and familial expectations.
> ████████████████████████████████████████████████████████████
> ████████████████████████████████████

Biswas Report, Ex. 1, at 10.

The defense does not, of course, contend that the foregoing societal, cultural and

familial pressures excuse Ms. Bhambi's admittedly criminal conduct. It does, however,

respectfully submit that these factors are relevant considerations in determining the appropriate sentence under 18 U.S.C. § 3553(a).

II.   *Throughout her life, Priya has proven to be an extraordinary daughter, sibling, friend and citizen.*

In her mother's words, Priya "has spent her entire life helping the community that has raised her and constantly putting the needs of others first. . . .."  Letter of Meena Bhambi (Exhibit 3).  Noting that "[h]er father told her as a teenager to be the absolute best she could be," Ms. Bhambi's mother offers that Priya "took that to heart to be the best daughter, best sister, best friend, best aunt, best role model, best employee and best example of excellence in the community."  *Id.* Even as a child, Priya "was kind enough to take care of kids if anyone needed help, first to give up what she had (food, seat, toys), welcome new people and teach anything that she knew."  *Id.* One childhood friend recalls, "[w]hen Priya found out that I was facing a suspension" in middle school, "she immediately stepped up in an attempt to protect me.  This is who Priya is.  She loves her family and friends.  She would do anything to help those she loves."  Letter of Lauren Barnes (Exhibit 7).

When Priya's father passed away, Priya readily and dutifully stepped into the "role of looking after her mother's emotional well-being, while her brothers took care of more practical matters."  Letter of Rajji Janjua (Exhibit 8).  "Priya would spend free time at home with her mother instead of going out with friends; she would bake for the family; she would accompany her mother to events and travel; . . . Priya would also make an effort to perform thoughtful deeds; in short, Priya . . . developed a caregiver personality."  *Id.*

"As Priya has matured this caregiving extends well past just her mother.  She is always helping others in whatever ways she can."  Letter of Rajji Janjua (Exhibit 8).  Priya has consistently proven herself a steadfast and unwavering pillar of support to friends and family in circumstances

both ordinary and extraordinary.  One friend of 35 years recalls Priya's selflessness after a cancer diagnosis:

> I was diagnosed with a rare form of cancer and despite Priya having gone through a traumatic experience with her own father battling cancer unsuccessfully with cancer years before, she was one of the first people by my side, taking me to appointments, and then staying by my side at home to ensure I had everything I needed.  I valued her companionship more than ever in that moment, because I understood how she was putting aside her own very valid emotions to help someone that she loved and I couldn't have been more appreciative and grateful to her for that level of care and devotion.

Letter of Supriya Refai (Exhibit 6).  Priya's sister-in-law similarly recalls, "when I was on bed rest after a C-section; Priya would prepare lunch for me daily and take care of all the children so I could rest, recover, and sleep peacefully.  Such commitment is truly rare to find."  Letter of Samriti Bhambi (Exhibit 5).  Another longtime friend of Priya's attests:

> even if it's been months since we have spoken, [Priya] constantly goes above and beyond what I ask of her.  I can think of many examples, but the ones that stand out to me the most are the small things she does that show me her empathy, and interest.  For example, it was my parents 50th anniversary, I was making a video of all their friends and family and was quite stressed trying to get it done so it would be a surprise.  I asked Priya to organize the videos from her immediate family.  Even with her busy work schedule, she did so quickly, and she even made sure to get videos from her extended family in England without me having to prompt her.  This was memorable to me because Priya was literally the only person I did not have to pester to help out, and she was able to sense what I needed.

Letter of Rajji Janjua (Exhibit 8).  The same friend writes that when her parents visit, Priya "always ask[s] about their needs – do they need any special food, do they need anything health wise?  Even if she is not going to be there she will leave a refrigerator of fresh foods she has prepared herself, remembering everyone['s] favorites."  *Id.*  These may seem like "small things" but it is "important to highlight how [Priya] is in her daily life, always willing to help, reliable, thoughtful, and generous with her time."  *Id.*

Priya serves as the "cornerstone" of her tight-knit extended family, "consistently putting the needs of others before her own." Letter of Samriti Bhambi (Exhibit 5). She dotes on her nieces and nephews, with her sister-in-law describing Priya as "a second mother to [her] children." Letter of Samriti Bhambi (Exhibit 5) (also recounting Priya's Christmas-time efforts for the children); *see also* Letter of Rohit Bhambi (Exhibit 4) (same). Currently, Priya provides crucial support to her aging mother, who describes Priya as her "best friend" and "companion." Letter of Meena Bhambi (Exhibit 3). Priya helps with her mother's daycare, "cleans the house, cares for the dog, . . . goes grocery shopping and cooks." *Id*. In her own words, Priya's mother would be "lost without her. I have 2 other lovely children, but [Priya] is the one who makes sure I am taken care of everyday, that I take my medications and get to my appointments. When I am unwell, I rely on her help to recover." *Id.*

These personal stories of genuine compassion and kindness—acts taken when nobody is looking, when there is no motive other than simply helping a friend or family member, are the true definition of a person, and their character. And, they are littered throughout the letters submitted to the Court. As Priya's mother explains, she "has never needed recognition for the good she does, she never looks for praise, she just simply takes action with no expectations." Letter of Meena Bhambi (Exhibit 3). "Making others feel good gives Priya joy. She has never asked anyone to do for her and often shies away from spotlight, but everyone she meets walks away touched by her kindness." *Id.*; *see also* Letter of Jatinder Sharma (Exhibit 9) ("Priya is the person who will help you do something as mundane as run an errand or as vast as plan a wedding, all without a moment's hesitation, and that is a rare quality to possess").

Perhaps most tellingly, Priya has continued to demonstrate extraordinary kindness and care for others, even under the strain of federal prosecution. Priya's mother writes:

watching her fight to be better (even with her world crashing down) makes me realize how amazingly good she is.  In bad times people can act out, but not her, she continues to give.  She volunteers at the church every week, she helps her nieces and their friends get ready for school plays by doing hair/makeup, she teaches her nephew how to cook, she volunteers with the non profit South Asian Nation.  She makes every moment special for the people in her life.

Letter of Meena Bhambi (Exhibit 3).

Priya has demonstrated a longstanding commitment to the less fortunate members of her community.  "[S]he quarterly makes the whole family donate their clothes and toys to the point that it is now a family routine.  She creates moments for her nieces and nephews to give back by boxing up and donating food so that they understand the value of contributing back to others."  Letter of Meena Bhambi (Exhibit 3).  Priya "will give what she has to others not because she has to or because she gets credit, but because she wants to."  *Id.*  In one striking example, the head of the Bhambi's family temple informed Priya's mother that Priya had been "privately put[ting] checks in the donation box and ask[ing] the temple to do good with it, but to please not announce her name."  *Id.*

In addition to donations, Priya has enthusiastically given her time and energy to a variety of charitable causes.  She volunteered at the Dimock Center in Roxbury "through Jumpstart teaching children in need how to read and simply giving them extra time that their parents who worked multiple jobs didn't have."  Letter of Meena Bhambi (Exhibit 3).  Priya also founded a non-profit Bhangra dance foundation, inspired in part by "the memory of her father who used to love dancing and taught her to dance as well."  Letter of Jatinder Sharma (Exhibit 9).  Priya is, according to one executive board member of the organization, "a foundational part [of its] success."  Letter of Chris Brady (Exhibit 10).  Through Boston Bhangra, Priya "spread[s] cultural awareness," and she "created the youth program to help south Asian children find pride in their American and South Asian cultures."  Letter of Meena Bhambi (Exhibit 3).  Priya's mother writes:

She answered every call in our community for kids looking for college advice, career advice and even just adjusting to the Indian American lifestyle.  Out of her own kindness she would bring community kids to events with her, take them out for 1:1 time to help understand what they needed and would come home so proud that she was able to help another person out.

*Id.*

From a young age, Priya was no stranger to hard work.  As the daughter of working class, immigrant parents, she began "helping in [her mother's] daycare" and babysitting when she was just in elementary school.  Letter of Meena Bhambi (Exhibit 3).  When she was 13, Priya "volunteered in an office and assisted with light administrative duties."  Letter of Rajji Janjua (Exhibit 8).  Later, after she entered the corporate workforce, Priya's mother observes, "I've never seen someone so driven and dedicated to the success of her leader. . . .  She never complained about the long days or hard work, she was so happy to add value and make things as easy as possible for everyone around her."  Letter of Meena Bhambi (Exhibit 3); *see also* Letter of Rajji Janjua (Exhibit 8) ("Several times when we have visited Brookline in the past, Priya had gotten work calls in evenings, and weekends.  Even after hours, she never ignored those calls, or emails. She would excuse herself, then answer her colleagues, and prioritized what she had to[], without complaint, always making sure she was doing her utmost"); Letter of Rohit Bhambi (Exhibit 4) ("From a professional perspective, [Priya] has been one of the most dedicated and committed people that I've ever seen").

Priya's decision to pursue a career in the pharmaceutical industry was driven in part by "a sense of purpose in the fight against cancer" stemming from the untimely loss of her father.  Letter of Rajji Janjua (Exhibit 8).  She ultimately worked her way up to becoming "the youngest VP at Takeda ever."  Letter of Rohit Bhambi (Exhibit 4).  Priya accomplished that feat, not by leveraging relationships or taking shortcuts, but "by dedicating her life to work."  *Id.*  Priya's career "was

everything to [her]." Letter of Priya Bhambi (Exhibit 2). She fully understands that the decisions

that bring her before this Court for sentencing have ended that career. *See* Letter of Priya Bhambi

(Exhibit 2).

*III.*　　*Priya believed she could get the work order fulfilled while simultaneously building her partner into a person she desperately wanted her family to accept.*

As reflected in Dr. Biswas' report, both before and after the events giving rise to this case,

████████████████████████████████████████████████████

████ Biswas Report, Ex. 1, at 9. Priya had remained in a prior relationship for ████████

████████████████████████████████████ *See* Ex. 1, at 5. ████████

████████████████████████████████████████████ Biswas

Report, Ex. 1, at 5. Dr. Biswas opines that Priya ████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Biswas Report, Ex. 1, at 9. ████████

████████████████████████████████████████████████████

Biswas Report, Ex. 1, at 5 (emphasis added).

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Biswas Report,

Ex. 1, at 5. ████████████████████████████████ Biswas

Report, Ex. 1, at 5.

It was this same year that Priya met Mr. Montronde on a dating app, meeting him in person

sometime later. ████████████████████████████████████

████████████ Biswas Report, Ex. 1, at 5. ████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████  Biswas Report, Ex. 1, at 10.

There is contemporaneous evidence that Ms. Bhambi genuinely believed Mr. Montronde could one day be fit to service the kinds of contracts at issue here.  As reflected in the Presentence Report, Ms. Bhambi wrote to Mr. Montronde that he could "fake it" until he "make[s] it for real." PSR at ¶22.  She likewise discussed with Mr. Montronde in real time about taking a "class together" to find "more content to blog."  PSR at ¶22.  While Ms. Bhambi fully accepts responsibility for her role in the criminal conduct at issue in this case, *see, e.g*., Letter of Priya Bhambi (Exhibit 2), the defense respectfully submits it is also important to consider her intent and the context for it.  Priya wanted the project to succeed, and she wanted, desperately, for her family to see Sam as a proper fit for her.

Again, this does not excuse Ms. Bhambi's conduct, but the defense respectfully submits it is relevant to this Court's determination of a fair and just sentence under § 3553(a).

IV.    *General sentencing principles and a Guidelines loss table that lacks empirical support and "wars with common sense."*

The controlling legal standards are by now well-rehearsed.  With the Supreme Court decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), federal sentencing has undergone dramatic changes, and the sentencing options available to district courts have significantly broadened.  *See, e.g., United States v. Taylor*, 532 F.3d 68, 69 (1st Cir. 2008) ("The Court's decision in *Gall*, combined with its decisions in *Kimbrough* . . . and *Rita v. United States*, makes clear that in the post-*Booker* world, district judges are empowered with considerable discretion in sentencing…").  No longer are district courts bound by the strictures of the Guidelines or even permitted to presume that the Guidelines provide the appropriate sentence in a given case.  *Gall*,

552 U.S. at 50 (the court "may not presume that the Guidelines range is reasonable").  Moreover,

under *Kimbrough*, courts are free to deviate from the Guidelines even where doing so "contravenes

a broad policy pronouncement of the Sentencing Commission."  *United States v. Politano*, 522

F.3d 69, 74 (1st Cir. 2008) (citation omitted); *see also, e.g.*, *United States v. Vanvliet*, 542 F.3d

259, 271 (1st Cir. 2008) (relying on *Kimbrough* for proposition "that district courts legitimately

may cite their own disagreements with Guidelines policy as justification for imposing a below-

Guidelines sentence").

 Few Guideline provisions have been subject to more consistent criticism than that

applicable to fraud offenses, which, according to the final PSR, accounts for a whopping 18-level

enhancement here.  As Judge Rakoff has poignantly explained:

> The notion that this complicated analysis, and moral responsibility, can be reduced
> to the mechanical adding-up of a small set of numbers artificially assigned to a few
> arbitrarily-selected variables ***wars with common sense***.  Whereas apples and
> oranges may have but a few salient qualities, human beings in their interactions
> with society are too complicated to be treated like commodities, and the attempt to
> do so can only lead to ***bizarre results***.

*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (emphasis added).  "By making

a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing

Commission effectively ignored the statutory requirement that federal sentencing take many

factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many

such sentences would be irrational on their face."  *Id.* at 351.

 Beyond this general concern about the fraud guideline's sentencing-by-numbers approach,

several judges have criticized the loss table on the grounds that the large sentencing increases it

calls for are utterly lacking in empirical support.[2]  Indeed:

> the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of ***speculation, whim, or abstract number-crunching*** than of any rigorous methodology—thus maximizing the risk of injustice. . . .  The Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data.

*Id.* (emphasis added); *see also United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) (unpublished) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances"); *United States v. Corsey*, 723 F.3d 366, 380 (2d. Cir. 2013) (Underhill, J., concurring) ("The three sets of amendments to the loss table of the fraud guideline . . . have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences.  Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission").

As the Second Circuit has expressly recognized, disagreement with the Sentencing Commission's "unusual[]" approach to fraud "is a circumstance that a sentencing court is entitled to consider" in imposing a variant sentence.  *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (citing *Kimbrough*, 552 U.S. at 101).  And district courts have, in practice, repeatedly varied downward from large GSRs driven by loss amount.  In doing so, several courts have been harshly critical of the fraud guideline.  *See United States v. Johnson*, No. 16-CR-457, 2018 WL

---

[2] The rationale underlying consideration of the GSR established by the Guidelines in weighing the § 3553(a) factors rests upon the assumption that the Sentencing Commission has "base[d] its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough*, 552 U.S. at 109.  As such, when a particular Guideline at issue lacks empirical support, the logic for a sentence driven by that Guideline provision diminishes.

1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) (imposing 24-month sentence despite GSR of 87-108 months, and observing, "[a]s far as this court can tell, the Sentencing Commission's loss-enhancement numbers ***do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime***" (emphasis added)); *Gupta*, 904 F. Supp. 2d at 355 (varying downward from GSR of 78-97 months to impose 24-month sentence); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (imposing a sentence of three and one-half years, despite advisory guideline range of life imprisonment, and noting "***the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense***" (emphasis added)); *United States v. Herink*, No. 10-CR-169, 2012 WL 3112002, at *7 (D. Neb. July 30, 2012) (imposing sentence of 18 months despite GSR of 51-63 months and explaining that "because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court afford[ed] them less deference than it would to empirically-grounded Guidelines"); *see also* Mark H. Allenbaugh, *"Drawn from Nowhere: A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data,"* 26 Fed. Sent'g Rep. 19, 23 (2013) ("It appears that in practice, loss has very little correlation to the ultimate sentence imposed, regardless of how it determines the advisory guideline range").  In short: "where . . . the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."  *Adelson*, 441 F. Supp. 2d at 515.

Here, subtracting the 18-level loss enhancement calculated by probation would yield a total offense level of 7 and a guideline sentencing range of just 0-6 months.  In these circumstances, the defense submits that the Court can and should impose an individualized sentence based on the particular facts and circumstances of this case, rather than a sentence driven almost entirely by the loss guideline.[3]

V.      *A sentence of 12 months is sufficient, and not more than necessary, to meet the sentencing factors outlined in 18 U.S.C. §3553(a).*

The issue presented here—as in all sentencing proceedings—is "what" punishment is fair, necessary, and appropriate, given all of the relevant facts and circumstances; or, in the words of 18 U.S.C. § 3553(a), what sentence is "sufficient, but not greater than necessary" to serve the sentencing goals enumerated in that statutory section.  "Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors." *Gupta*, 904 F. Supp. 2d at 350.  What sentence should be imposed ultimately involves a complicated analysis of the individual involved: what punishment has already been inflicted, is she likely to engage in recidivist behavior, has she been rehabilitated or is she particularly receptive to rehabilitation, and whether her incarceration will significantly further the goals of sentencing.  It is a complex matrix of factors, ultimately dependent upon the individual human being at issue, which is precisely why our criminal justice system has vested this Court with discretion to differentiate and individualize sentencing.  Here, given Priya's

---

[3] Even under the Guidelines, courts are permitted to depart where a defendant's Guidelines range substantially overstates the seriousness of the offense. *See, e.g.*, U.S.S.G. §2B1.1, Application Note 21(C) (providing court may depart downward where the loss calculation significantly overstates the seriousness of the offense).  And, courts possess the authority to depart when a case involved factors taking it "outside the heartland," or where a combination of factors warranted departure, even if any individual factor did not warrant departure.  *See, e.g.,* U.S.S.G. §§5K2.0(a)(1)-(4); 5K2.0(c); *United States v. Jagmohan*, 909 F.2d 61 (2d Cir. 1990).

longstanding record of community service and charity, her family circumstances, a lifetime of empathy and good works without a single criminal infraction, and all of the factors addressed in Dr. Biswas' report, the defense respectfully submits that a sentence of 12 months is "sufficient, but not more than necessary" to serve the sentencing goals set forth in § 3553(a).

First, as detailed extensively *supra*, a sentence of 12 months is appropriate given the history and characteristics of Ms. Bhambi.  *See* 18 U.S.C. §3553(a)(1).  Priya has led an extraordinary life of devoted service to her family and her community, beginning when she was just a child and continuing even through this prosecution.  Priya's good deeds were "not performed to gain status or enhance h[er] image," but instead "were unknown to all but a few people until the time of h[er] sentencing."  *Adelson*, 441 F. Supp. 2d at 513.  Now, more than ever, these good deeds should count for something:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*Adelson*, 441 F. Supp. 2d at 513–14.

Likewise, in weighing the pertinent "history and characteristics," the defense respectfully submits the Court should also consider the perilous state of Ms. Bhambi's future. She is now unemployable in the corporate world and will need to forgo a corporate career and support herself some other way.  The defense further submits that the Court can and should consider the opinions and findings of Dr. Biswas.

Second, Ms. Bhambi is a first-time offender, having never in life been in contact with the criminal justice system, much less convicted of a crime.  This is also quite important from a

sentencing perspective.  As noted in *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007), there is "a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I." (*citing* Michael Edmund O'Neill, Abraham's Legacy: An Empirical Assessment of (Nearly) First-Time Offenders in the Federal System, 42 B.C. L.Rev.291 (2001)).  "Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism."  *Id*.  Here, based on everything there is to know about Priya, there is no serious risk that she will engage in any future criminal conduct, but certainly a sentence of 12 months will address any *arguendo* risk.

Third, in terms of general deterrence, to the extent this case provides a warning to anyone in the greater community, there are several worthy messages to be issued by the sentencing in this case, all of which would be delivered by a sentence of 12 months.  While Priya's family and some friends remain steadfastly behind her, the remainder of her life is in tatters. Though she spent a lifetime building a reputation of character, honesty, humility and generosity, that reputation has been destroyed.  Though she spent a lifetime of hard work to earn her place in the corporate world, all of that is now gone too.  She faces an uncertain future, along with the prospect of huge restitution and forfeiture orders in this case.  The bottom line is that any citizen paying even an iota of attention to this case would be adequately deterred from the events to date: no rational human being would intentionally endure the pain and devastation inflicted upon her and her family. Certainly, to the extent any further deterrent is required, a sentence of 12 months incarceration would be sufficient.  *See Adelson*, 441 F. Supp. 2d at 514 (noting "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"); Michael Tonroy, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28

(2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects").

Fourth, considering the type of person Priya Bhambi is, as detailed in the letters to the Court, a jail term is not necessary to punish her. Priya has been punished enough for 10 lifetimes. One close friend writes:

> I know [Priya] has been struggling with not being able to get a job. It is not in her personality to not be productive, or to sit idly by. She has vocalized to me that not working has been difficult, and there is a deep sadness when she speaks about it. . . . I sense disappointment as the realization sets in that all she has worked hard to achieve may be lost. Priya has also faced a lot of scrutiny from friends, family, strangers, and people in the South Asian community since her arrest, especially as the story caught the attention of the media. . . . This treatment by others, along with uncertainty over the future has created a grief and sorrow that I have not heard from her before. Everything she has known has basically turned upside down. I believe it has been a daily internal struggle reconciling all these feelings but having these months to reflect has allowed her to process the gravity of the situation.

Letter of Rajji Janjua (Exhibit 8). And, she will continue to be punished for a lifetime. The ramifications of her conduct—legal and moral—will hang around her neck like an albatross. Priya has to live with the disappointment and turmoil she has brought unto her family, and there is no greater punishment for a human being of Priya's background, character and nature. As Priya herself notes in her letter:

> I am filled with remorse for my mistakes. It has changed me and changed the course of my life. I know I will never make this mistake again, not only because it is wrong, but also because there is no reward worth all the trauma that has occurred. I would not dare put myself in a situation like I did or ask any of my loved ones to go through this pain again.

Letter of Priya Bhambi (Exhibit 2). The Court simply does not need to imprison a person like Priya for a day longer than 12 months to adequately punish her. And, of course, a term of imprisonment not only punishes Priya, but her family, and especially her mother, who writes:

> I could not imagine what I would do without her. Seeing her struggle with her world being ripped apart has been daunting. The laughter and joy inside of her has

diminished and as her mom there is nothing I can do.  The punishment she has
already endured by losing her career, her friends, her reputation and voice has been
incredibly difficult for all of us.  All I want is for her to heal and find a new path
where she can feel valuable again.

Letter of Meena Bhambi (Exhibit 3).

Fifth, to the extent the Court is concerned with disparity, deviations of far greater
magnitude than the sentence suggested herein routinely occur.  As noted *supra*, in *Adelson*, Judge
Rakoff sentenced the defendant to three and one-half years in jail where the advisory guideline
range was life imprisonment.  *See also* Section IV, *supra* (citing additional cases).

Sixth, and finally, §3553(a)(7) calls for the Court, in fashioning a sentence, to consider the
need to provide restitution to any victims of the offense.  A sentence of 12 months, as contrasted
with some greater sentence, provides Priya the ability to begin that effort as early as possible.

VI.     *Conclusion*.

For all of the reasons articulated herein, and those to be advanced at the hearing, the defense
respectfully submits that a sentence of 12 months is fair, just, and sufficient to meet the sentencing
objectives that underlie §3553(a).

Respectfully Submitted,
PRIYA BHAMBI,
By Her Attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
Mass. Bar No. 630584
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated:  October 25, 2024

20

**<u>Certificate of Service</u>**

     I, Robert M. Goldstein, hereby state that on this date, October 25, 2024, a true copy of the foregoing document has been served, via electronic mail, on Assistant U.S. Attorneys Leslie Wright and Mackenzie Queenin.


                                      **<u>/s/ Robert M. Goldstein</u>**
                                      Robert M. Goldstein